[Cite as *In re K.S.*, 2024-Ohio-3312.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE K.S., ET AL.          :

                            :          No. 113829

Minor Children             :

                            :

[Appeal by R.D., Mother]    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 29, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22912856 and AD22912857

---

### *Appearances:*

Christina M. Joliat, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

---

MARY EILEEN KILBANE, P.J.:

{¶ 1} Appellant, R.D. ("Mother"), appeals from the juvenile court's March 7, 2024 judgment entries that terminated her parental rights and granted permanent custody of her minor children, B.S. (d.o.b. 12/16/2017) and K.S. (d.o.b. 1/15/2020), to the Cuyahoga County Division of Children and Family Services ("the

agency" or "CCDCFS").[1]  For the following reasons, we affirm the juvenile court's judgment.

**Factual and Procedural History**

{¶ 2}  On December 15, 2022, the agency filed complaints for neglect and temporary custody to CCDCFS in regard to B.S. and K.S. that alleged:

> (1) Mother has substance abuse issues related to fentanyl that prevent her from providing appropriate care for her children, and Mother overdosed on fentanyl while caring for the children in her home.
> (2) Mother suffers from anxiety and depression that impact her ability to provide appropriate care for the children; Mother is overwhelmed by her caretaking responsibilities.
> (3) Ke.S., biological father of B.S. and alleged father of K.S., has substance abuse issues related to alcohol and opioids.  Ke.S. recently completed an in-patient treatment program and resides at a sober-living house so that he is unable to provide the children's basic needs.
> (4) Ke.S. has multiple convictions for domestic violence and drug possession.
> (5) K.D., the presumptive father — by marriage — of K.S., has failed to support, visit, or communicate with K.S.  Mother and K.D. are married, living separately, and K.D.'s whereabouts are unknown.
> (6) John Doe, alleged father of K.S., has failed to establish paternity or to support, visit, or communicate with the child since her birth.

The complaints sought a disposition of temporary custody to CCDCFS.[2]

{¶ 3}  On December 20, 2022, the trial court appointed Elba Heddesheimer as guardian ad litem ("GAL") for B.S. and K.S.  On January 9, 2023, the trial court

---

[1] The agency filed separate complaints on behalf of B.S. and K.S. in Cuyahoga J.C. No. AD22912857 ("B.S.'s case") and Cuyahoga J.C. No. AD22912856 ("K.S.'s case"), respectively.  The two cases were tried together, the appeal incorporates the trial court's March 7, 2024 judgment entries issued separately in the two cases that are nearly identical, and this opinion references both cases collectively.

[2] Mother filed the instant appeal; Ke.S. and K.D. did not appeal the trial court's judgments.  Thus, this opinion addresses only the termination of Mother's parental rights.

committed the children to the predispositional emergency temporary custody of the agency and temporarily placed them with a relative. Substance abuse services and a safety plan were offered to Mother, and she was provided a referral for an alcohol and other drug assessment. On that same date, the court appointed counsel for Ke.S., the biological father of B.S. and alleged father of K.S.

{¶ 4} On January 31, 2023, a case plan for Mother was filed with the court. The case plan indicated Mother overdosed on fentanyl twice in November 2022 — once in front of her children — and tested positive for cocaine, amphetamines, and benzodiazepines on December 7, 2022. The plan noted Mother had parenting deficits that impacted the well-being and care of the children, and Mother expressed feelings of being overwhelmed when dealing with daily tasks within the home. The plan stated Mother was diagnosed with anxiety and depression. The case plan recommended Mother participate in parenting classes, a psychiatric/psychological evaluation, a drug and alcohol assessment, and submit random urine screens.

{¶ 5} The case plan also noted Ke.S.'s history of mental health issues, alcohol abuse, and his recent involvement with an intensive outpatient program. Ke.S. was recommended to undergo a psychiatric/psychological assessment, drug/alcohol assessment, and submit random urine screens. Pursuant to the case plan, both Ke.S. and K.D. were to contact the child support enforcement agency and establish paternity for the children.

{¶ 6} The case plan granted Mother and Ke.S. weekly supervised visitation with the children. While the children were initially placed temporarily with a

relative, the relative was unwilling or unable to provide care for the children, and they were moved to foster care. The case plan identified reunification as its goal for the children and Mother.

{¶ 7} K.D. and Mother were married at the time of these proceedings and, therefore, K.D. was presumed by marriage to be the father of K.S. On February 15, 2023, the trial court appointed counsel for K.D.

{¶ 8} On March 1, 2023, the GAL submitted a report to the court following her contact with Mother, Ke.S., B.S., K.S., the foster parents, and caseworker Nikita Phillips ("Phillips"). According to the GAL, the children's basic needs were met and they both needed speech therapy. The foster parents also had concerns that K.S. should be tested for autism. Mother informed the GAL that she was engaged in an intensive outpatient program three times a week and received mental health services, including weekly therapy. Mother reported her sobriety date as November 2022, and stated she provided urine screens twice weekly.[3] The GAL stated she had had no contact with Ke.S., who was reportedly in a residential drug treatment facility. The number provided to the GAL for K.D. was not in service, and she was unable to contact him. The GAL stated that at that time it was in the children's best interest to grant temporary custody to the agency.

---

[3] Other than a statement in the agency's June 6, 2023 semiannual review ("SAR") — that referenced a recommendation in March 2023 for Mother's attendance at a partial hospitalization program — the record does not support Mother's claim that she was engaged in an intensive outpatient program, submitted urine screens, and received mental health services in March 2023.

**{¶ 9}** On April 10, 2023, the magistrate conducted a hearing that the following individuals attended: Mother and her counsel, K.D. and his counsel, the GAL, counsel for K.S.; counsel for Ke.S., counsel for CCDCFS, and Phillips. The trial court granted the agency's oral motion to amend the complaint, and Mother and K.D. stipulated to the allegations of the amended complaint. The court heard evidence from Phillips, accepted the GAL's recommendation, and adjudicated K.S. and B.S. to be neglected. The trial court terminated the predispositional custody and committed the children to the temporary custody of CCDCFS. The court further found that Mother had been referred to mental health services, parenting classes, and an alcohol and other drug assessment, and she visited weekly with the children. The court found that Mother failed a drug screening on March 30, 2023, and the court ordered Mother to submit to a drug test within 24 hours. K.D. denied parentage and was referred for paternity testing. Alleged father Ke.S. was not engaged with the agency; he may have been in sober living.

**{¶ 10}** On April 17, 2023, Mother started an intensive outpatient program at Caritas Wellness Center ("Caritas") that required treatment three times a week for 90 days.

**{¶ 11}** On June 6, 2023, the agency completed SAR. The SAR noted the children's placement with foster parents who met their basic and special needs. Both children were to be referred for mental health services, and K.S. was to undergo testing in regard to autism. As of the date of the review, Mother had not participated in any mental health services, and the parenting classes were scheduled to begin in

July 2023.  The review noted Mother had not made significant progress on her case plan services and failed to demonstrate behavioral changes.  The review also noted that in March 2023, Asurgent Health recommended that Mother attend a partial hospitalization program that she did not pursue.[4]  The SAR indicated Mother received substance abuse treatment at Caritas.  The SAR stated Ke.S., a resident at a sober living facility, was unable to provide basic needs for the children, and neither Ke.S. nor K.D. had established paternity of K.S.

{¶ 12} In September 2023, Caritas discharged Mother due to inconsistent attendance, positive urine screens, and failure to participate in mental health services and parenting classes.  Caritas recommended Mother complete residential treatment.  In October 2023, the agency referred Mother to New Visions Unlimited ("New Visions") for mental health and parenting classes.

{¶ 13} On October 31, 2023, the agency approved a kinship home assessment for the children's alternative placement with K.D.'s brother and his husband.  On November 9, 2023, the agency filed a motion to modify temporary custody to permanent custody to CCDCFS.

{¶ 14} On December 8, 2023, the agency filed a SAR report that indicated the children continued to reside with their foster parents where their basic and special needs were met.  According to the report, Mother participated in weekly

---

[4] The record does not include Mother's records from Asurgent Health, and the testimony did not reference any treatment from this provider.

supervised visitation, but found it difficult to balance her work responsibilities and visitation:

> [Mother] is often late which causes the children distress. She also struggles with keeping them busy or entertained. She does not bring activities for them to do so they become bored and this leads to behavior increasing. This leads to times when [Mother] is overwhelmed during visits and becomes upset and wants the visit to end early.

Dec. 8, 2023 SAR report, p.2. Additionally, the report stated that Mother failed to engage in services at New Visions and visitations between the children and the kinship providers had been initiated.

{¶ 15} On February 15, 2024, the GAL requested that the court appoint counsel for B.S. based upon a perceived conflict between the child's wishes to live with Mother and the child's best interest, and the trial court subsequently appointed counsel.

{¶ 16} On February 26, 2024, the GAL provided an updated report following contact with Mother, Ke.S., B.S., K.S., the foster parents, and Phillips. She described the children as very active, and both had been referred for appropriate evaluations. The GAL reported that B.S. "is close to his mother and has a strong bond with her." The GAL stated that Mother takes prescribed medication for her anxiety. Mother acknowledged to the GAL that she had not completed the recommended services and voiced her need to work in order to pay the mortgage and care for her parents who live with her. The GAL noted there was an outstanding warrant for Mother's arrest due to her failure to comply with the terms of her probation. The GAL

described the children as "young and vulnerable" with behavioral issues and speech delay that require intervention. The GAL had no contact with Ke.S. or K.D. The GAL stated B.S. and K.S. needed "a stable and permanent home" and recommended it was in the children's best interests to grant permanent custody to the agency.

{¶ 17} On March 6, 2024, the children moved into the home of the kinship providers.

{¶ 18} On the same date, the trial court conducted trial on the agency's motion to modify temporary custody to permanent custody. None of the parents — Mother, K.D., and Ke.S. — were present for trial, and their counsel requested a continuance of the trial. Mother's counsel stated, "I did receive information, as much as possible in the circumstances from my client, that she is being admitted to Legends Recovery today." Tr. 6. Counsel argued for a continuance because Mother was making her third attempt at substance abuse treatment since the case was filed and no prior continuances had been granted. The agency opposed the motion arguing that the children had been in its custody for over a year; Mother had failed to complete any services; Mother's alleged participation in treatment starting on the day of trial appeared dilatory; the length of delay of trial was uncertain; all necessary witnesses were present and prepared to testify; and the local rules precluded continuance on the day of trial if the circumstances leading to the continuance — such as in this scenario — were known prior to trial. The trial court denied the parties' motion for continuance.

{¶ 19} The trial court heard testimony from Angel Bragg ("Bragg"), a CCDCFS case worker; Jenny Lemmer ("Lemmer"), the clinical director of New Visions; and the GAL.

**Angel Bragg**

{¶ 20} Bragg testified that B.S. and K.S., then aged six and four, came under the agency's custody when Mother overdosed on fentanyl at her home, in the presence of the children. Bragg stated the children entered the agency's temporary custody, and the agency developed a case plan with a goal for reunification of the family.

{¶ 21} Bragg testified that the agency referred Mother to Caritas in April 2023, for substance abuse and mental health services as well as parenting classes. Mother participated in an intensive outpatient program for substance abuse but was discharged from the program in September 2023, due to nonengagement. Per Bragg, Mother stated the staff at Caritas did not work with her. Bragg further testified that the agency next referred Mother for substance abuse services at New Visions, but she was discharged in February 2024, due to lack of engagement. The agency also referred Mother to two facilities for parenting classes but Mother never fully participated.

{¶ 22} Bragg stated that Mother failed to resolve any of the issues — substance abuse, mental health, and parenting — detailed in her case plan, and described Mother's participation in the referred services as inconsistent. Bragg

further stated that Mother blamed her inability to maintain work on her frequent court appearances and interactions with the agency.

**{¶ 23}** Bragg testified that Mother regularly participated in weekly supervised visitation with B.S. and K.S. and weekly phone calls with the children. Bragg also stated that at an unspecified time period, Mother "stopped showing up" or would cancel or be late for the scheduled visits. Tr. 51. Bragg indicated that Mother interacted with both children although she was better able to engage with B.S. Bragg further stated that B.S. "is very attached to mom," and K.S. did not exhibit signs of attachment although she enjoyed being coddled by Mother. Tr. 53. At approximately forty percent of the visitations, Mother would end the visits prematurely because she became overwhelmed with and frustrated by the children. Mother's last visit occurred the week prior to trial when she engaged with both children.

**{¶ 24}** Bragg stated that neither Ke.S. nor K.D. established paternity for K.S.; she has had no contact with K.D.; and neither Ke.S. or K.D. has taken any steps in pursuit of their case plan objectives. She also stated that there were outstanding warrants against K.D., and Ke.S. had a history of domestic violence. During the pendency of the case, K.D. made no contact with the children. Ke.S. attended two visits with the children and has not seen them since September 2023.

**{¶ 25}** Bragg stated that the agency found kinship relatives — related to the presumptive father, K.D. — who are interested in legal custody, adoption, or permanent placement. Bragg testified that the agency sought permanent custody

because Mother made no progress on the case plan, and neither Ke.S. nor K.D. have made progress on the case plan or indicated an interest in having the children placed with them. Bragg testified that she unsuccessfully attempted to contact Mother through phone calls and unannounced home visits for one month prior to trial. However, Bragg then stated Mother texted her two days prior to trial writing that she was entering a drug treatment center the day before trial.

**Jenny Lemmer**

{¶ 26} Lemmer, the clinical director of New Visions, testified as to Mother's course of treatment at her facility. The agency referred Mother for chemical dependencies and biopsychosocial assessments that Mother completed on November 6, 2023.

{¶ 27} Mother's initial assessment stated that in the past 14 years she has maintained sobriety for only three years. During the assessment, Mother denied poor participation at Carnitas; Mother claimed she missed only one class at the program but she was asked to engage in drug court, and she was not interested in doing so. The evaluator/assessor noted that the Carnitas discharge summary recommended Mother pursue a higher level of care, namely residential treatment. During the assessment, Mother denied use of kratom yet her urine screen was positive for this substance.

{¶ 28} The New Visions assessor made these findings and recommended Mother for a partial hospitalization program:

Client was oriented x4, easily engaged in conversation, had firm convictions of what happened at the previous treatment agency and reports she was not treated properly while at the previous treatment agency, they falsely reported her over many things. Client struggled to understand her level of addiction to substance use, feels everyone is making much more of what it actually is. Client lacks the understanding of how her addictions, over the years, have affected herself, her family and especially her children and how her inability to maintain sobriety is clearly affecting her appropriate decision-making skills concerning all of their lives. . . . [T]his client is diagnosed with Alcohol use disorder – Mild, in remission, Amphetamine use disorder – Mild, in early remission, Methamphetamine use disorder – Severe, Cocaine use disorder – Mild in early remission, Opioid use disorder – Moderate, in early remission and Kratom use disorder — Moderate. Client is recommended for [a partial hospitalization program.] Client will be referred for an updated psych evaluation.

Nov. 6, 2023 Comprehensive Diagnostic Assessment, p. 11.

{¶ 29} Lemmer described Mother's participation in the partial hospitalization program as minimal, and she was noncompliant with drug screens. While urine screens were required at least once a week, Mother submitted only four urine screens on November 7, 2023, December 18, 2023, January 17, 2024, and January 31, 2024. All four drug screens reflected positive results of varying combinations of these substances: benzodiazepines, amphetamines, methamphetamines, kratom, tramadol, alcohol, and anticonvulsants. On February 1, 2024, New Visions discharged Mother from the program due to nonengagement in services, poor attendance, and failure to provide random drug screens. New Visions recommended Mother for detox and residential treatment, following which she was encouraged to reengage in the partial hospitalization program.

**{¶ 30}** Mother's psychiatric assessment at New Visions diagnosed her with major depressive disorder, recurrent episode with psychotic features, generalized anxiety disorder, and borderline personality disorder. Lemmer testified that Mother did not attend psychiatric counseling on a consistent basis.

**{¶ 31}** Lemmer also stated that depending upon the flexibility of one's employment it may be difficult to hold a full-time job and participate in a partial hospitalization program along with the additional weekly counseling required by the program. However, no testimony was presented to demonstrate how, if at all, Mother's employment affected her participation with the recommend therapies.

**{¶ 32}** Lemmer testified that Mother did not meet any of her treatment goals, and she still needs the recommended services.

**GAL**

**{¶ 33}** The GAL testified that pursuant to her independent investigation she found permanent custody to the agency was in the children's best interests. The GAL noted that Mother has made no progress on her case plan for over a year; Mother continued to test positive for illegal substances; and Mother had an outstanding warrant. The GAL testified that each time she met with Mother, the GAL emphasized the need for Mother to comply with the case plan but Mother often was focused on the need to work and earn enough money to pay her mortgage and car payment and care for her parents. Bragg further testified that Mother loves B.S. and K.S., and she wants to be with her children.

**{¶ 34}** Per the GAL, the kinship placement couple was willing to have Mother communicate with the children via FaceTime as well as participate in face-to-face visits.

**{¶ 35}** The GAL conceded that B.S. informed her he wanted to return to the care and custody of Mother and, due to that preference, the GAL asked the trial court to appoint counsel for B.S.

**{¶ 36}** In closing arguments, B.S.'s counsel stated that B.S.

> wants nothing more than his mom to get sober, but he's happy where he is, and he's happy that his care — current caregivers want to adopt him. And if the adoption does go forward, he's happy that he'll get to have safe contact with his mom. And that's really what he wants me to advocate for him today.

Tr. 94.

**{¶ 37}** Pursuant to the evidence, the trial court found by clear and convincing evidence that the agency provided relevant services — specifically substance abuse, mental health, and parenting classes to Mother and the need for Ke.S. and K.D. to establish paternity and utilize agency services. Pursuant to R.C. 2151.414(B)(1)(a), the trial court found that the children could not or should not be placed with their parents within a reasonable time because: (1) Mother continuously and repeatedly failed to substantially remedy the conditions causing the children's placement with the agency, (2) Mother's chronic mental illness or chemical dependency is so severe that she is unable to provide an adequate permanent home for the children at the present times or within one year, (3) Mother demonstrated a lack of commitment toward B.S. and K.S. by failing to regularly support, visit, or

communicate with the children, or by other actions showing an unwillingness to provide an adequate permanent home for them, (4) K.D. abandoned K.S. and Ke.S. abandoned B.S. and K.S., (5) Mother is unwilling to provide food, clothing, shelter, and other basic necessities for the children to prevent them from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect, (6) Mother and Ke.S. failed to appear for trial, and (7) Mother and K.D. have open warrants. The trial court found reasonable efforts had been made to return the children to the parents' home and reunify the family and the children's return to the homes of their parents would be contrary to the children's best interest.

{¶ 38} The trial court further found it was in the best interests of the children to be placed in the permanent custody of CCDCFS. The trial court, pursuant to its March 7, 2024 judgment entries, terminated its prior order committing the children to the temporary custody of the CCDCFS; terminated the parental rights of Mother, K.D., Ke.S, and John Doe; and committed B.S. and K.S. to the permanent custody of the agency.

{¶ 39} On April 17, 2024, Mother filed a timely appeal, presenting two assignments of error for our review:

> Assignment of Error I: The trial court's order granting permanent custody to the agency was not based upon sufficient clear and convincing evidence, was against the manifest weight of the evidence, and it erred in finding permanent custody to be in the best interest of the child.
>
> Assignment of Error II: The trial court's denial of Mother's request for a continuance was material and in error.

**Legal Analysis**

**Manifest Weight of the Evidence**

{¶ 40} In her first assignment of error, Mother argues that the trial court's grant of permanent custody of B.S. and K.S. to the agency was against the manifest weight of the evidence, not supported by clear and convincing evidence, and not in the best interests of the children.

{¶ 41} A parent has a fundamental interest in the care and custody of his child. *In re L.W.*, 2019-Ohio-1343, ¶ 20 (8th Dist.). However, parental rights are not absolute: "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). "By terminating parental rights, the goal is to create 'a more stable life' for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re R.G.*, 2016-Ohio-7897, ¶ 21 (8th Dist.), quoting *In re N.B*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, *5 (5th Dist. Aug. 1, 1986).

{¶ 42} When reviewing a custody case for manifest weight of the evidence,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id*. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the

witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14 (8th Dist.).

{¶ 43} On a motion for permanent custody, a juvenile court must satisfy the two-prong test set forth in R.C. 2151.414 before it can terminate parental rights and grant permanent custody to the agency. The juvenile court must find by clear and convincing evidence that (1) any one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) that it is in the best interest of the child to grant permanent custody to the agency. *In re R.G.*, 2020-Ohio-3032, ¶ 19-20 (8th Dist.).

{¶ 44} Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

## A. R.C. 2151.414(B)(1) Findings

{¶ 45} The juvenile court must find by clear and convincing evidence that one of the following five conditions applies under R.C. 2151.414(B)(1):

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1).

{¶ 46} The juvenile court addressed the first prong of the statutory test by finding that B.S. and K.S. could not or should not be placed with Mother within a

reasonable time pursuant to R.C. 2151.414(B)(1)(a).  To support a finding that a child cannot or should not be placed with a parent within a reasonable time, the trial court looks to R.C. 2151.414(E)'s 15 enumerated factors.  The trial court in the instant case found the presence of (E)(1), (2), (4), (10), (14), and (16) factors supported its decision.  R.C. 2151.414(E) states, in pertinent part:

> (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(10) The parent has abandoned the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(16) Any other factor the court considers relevant.

{¶ 47} The record supports a finding that B.S. and K.S. could not or should not have been placed with Mother within a reasonable time pursuant to the (E)(1) factor. The record demonstrates that in January 2023 the agency created a case plan for Mother that addressed substance abuse, mental health, and parenting. Mother was referred to Caritas and New Visions where she could obtain substance abuse, mental health, and parenting services. Mother engaged in substance abuse services but was unsuccessfully discharged from the programs. Mother underwent a psychological evaluation at New Visions but did not consistently participate in therapy. And Mother did not participate in parenting classes. Mother failed to remedy the problems that initially caused the removal of her children.

{¶ 48} Since a court need only find one of the (E) factors applies to support a finding that children cannot or should not be placed with their children, we need not analyze the remaining factors pertaining to Mother. R.C. 2151.414(E).

{¶ 49} We find there is no basis for Mother's argument that her attempts to engage in the case plan services, although unsuccessful, warranted the trial court's

extension of the children's temporary custody rather than proceeding with the permanent custody hearing. A trial court may extend a temporary custody order up to six months in time if "there has been significant progress on the case plan." R.C. 2151.415(D)(1). The record does not demonstrate significant progress by Mother and, therefore, the trial court would not have been warranted in extending the children's temporary custody with the agency.

{¶ 50} The trial court satisfied the R.C. 2151.414(B)(1) findings — the first prong of the statutory test — when it applied the (E) factors to support its conclusion that B.S. and K.S. should not or could not be placed in Mother's care and custody.

## B. Best Interest of the Child Findings

{¶ 51} Once the trial court found that one of the enumerated R.C. 2151.414(B)(1) factors was present, the court then moved to the second prong of the test and conducted an analysis of the children's best interest. The juvenile court had to find by clear and convincing evidence that it was in the children's best interests to grant permanent custody to the agency. *In re L.W.*, 2019-Ohio-1343, at ¶ 36 (8th Dist.); R.C. 2151.414(D). On appeal, the court reviews a trial court's best interest analysis for an abuse of discretion. *Id.* at ¶ 37. The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983); *Johnson v. Abdullah*, 2021-Ohio-3304. Such broad discretion applies in a permanent custody hearing. *In re A.W.*, 2020-Ohio-3373, ¶ 25 (8th Dist.).

{¶ 52} Mother argues that the record does not demonstrate permanent placement of B.S. and K.S. with the agency was in their best interests. Specifically, Mother argues that she engaged in her case plan; she and B.S. have a close bond and he wanted to reside with Mother; Mother was developing a close bond with K.S; and the agency could have established a secure placement through legal custody. The agency contends the evidence demonstrates it is in the children's best interests to be permanently placed with the CCDCFS.

{¶ 53} To determine the best interest of a child, the trial court considers all relevant factors including, but not limited to, those listed in R.C. 2151.414(D)(1)(a)-(e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

Not one factor listed in R.C. 2151.414(D)(1) is given greater weight than any other factor and only one of the statutory factors needs to be found in favor of the award of permanent custody. *In re L.W.* at ¶ 39, quoting *In re Schaefer*, 2006-Ohio-5513, ¶ 56. The focus of a best interest determination is the child, not the parent. *In re R.G.*, 2016-Ohio-7897, at ¶ 28 (8th Dist.), citing *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.); *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist. 1994).

{¶ 54} The record reflects that the children have not resided with Mother since January 2023, when Mother overdosed on fentanyl in the house where the children lived with her. Since that time, the agency temporarily placed the children with a family member, moved them to foster care, and then to a kinship placement with the potential for a permanent placement.

{¶ 55} Mother and the children have scheduled weekly supervised visits. Mother's participation in the scheduled visitations is inconsistent at times and often she discontinues the visitations early when she is frustrated or overwhelmed by the children. The GAL indicated Mother wants to be with her children.

{¶ 56} Mother and B.S. share a bond. The GAL testified that B.S. wanted to reside with Mother but the GAL recommended that the trial court grant permanent custody to the agency because Mother has unresolved substance abuse and mental health issues, and the children require a stable and permanent home. According to

B.S.'s counsel, B.S. prefers to remain in his kinship placement and be adopted while experiencing safe contact with Mother who hopefully will lead a sober lifestyle.

{¶ 57} We recognize the bond between Mother and B.S., yet the bond is not sufficient to establish that it was in B.S.'s best interest to be placed with Mother. *See In re Holyak*, 2001 Ohio App. LEXIS 3105, *10 (8th Dist. July 12, 2001) ("But having a good relationship with the children is not enough.").

{¶ 58} K.S. was only four years old at the time of the custody hearing. The record did not reflect a similar bond between Mother and K.S. although K.S. enjoyed being coddled by Mother. A juvenile court properly considers a GAL's recommendation on a permanent custody motion — and specifically as part of a best interest analysis — where the child is too young to verbalize her wishes. *In re R.A.*, 2021-Ohio-4126, ¶ 52 (8th Dist.), quoting *In re B/K Children*, 2020-Ohio-1095, ¶ 45 (1st Dist.). The GAL recommended the court grant permanent custody of K.S. to the agency.

{¶ 59} "A child's best interests require permanency and a safe and secure environment." *In re Holyak* at *10. Children deserve a legally secure, permanent placement where they can be safe, thrive, and have all their needs met. Such a placement could not be accomplished with Mother. Mother struggled with substance abuse, mental health, and parenting and was unwilling or unable to fully engage in the referral services.

{¶ 60} Further, a trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to

Mother's custody. *In re E.J.*, 2023-Ohio-1376, ¶ 47 (8th Dist.); *see In re Mayle*, 2000 Ohio App. LEXIS 3379, *20-21 (8th Dist. July 27, 2000) (After finding that a child cannot or should not be placed with a parent, the trial court is required by statute to place the child with someone other than the parent.). Thus, the trial court's initial finding that it could not or should not place B.S. and K.S. with Mother precluded return of the children to Mother's care and custody.

{¶ 61} We find that the record provided the trial court with clear and convincing evidence to find permanent custody to the agency, rather than Mother, was in the children's best interest.

{¶ 62} The record demonstrates that the juvenile court complied with the statutory requirements of R.C. 2151.414(B)(1) and 2151.414(D) when it determined (1) the evidence showed that B.S. and K.S. could not or should not be placed with Mother within a reasonable time and (2) it was in the children's best interests to be placed in the permanent custody of the agency.

{¶ 63} Mother's first assignment of error is overruled.

**Motion to Continue**

{¶ 64} In her second assignment of error, Mother argues the trial court's denial of her motion to continue the custody trial was in error.

{¶ 65} Biological parents have a constitutionally protected right to be present at a permanent custody hearing. *In re Sears*, 2002-Ohio-368, ¶ 11 (10th Dist.). Typically the decision whether to grant a continuance lies within the sound discretion of the trial court, and we will not reverse the decision on appeal absent an

abuse of that discretion. *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). The same broad discretion is afforded to the trial court regarding a permanent custody hearing. *In re D.T.*, 2019-Ohio-4895, ¶ 15 (8th Dist.).

{¶ 66} Moreover, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Unger* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 67} Where a nonincarcerated parent fails to appear at a hearing and challenges the trial court's refusal to continue a permanent custody hearing to accommodate the parent's circumstances, the appellate courts have applied the factors set forth in *Unger* to determine whether the court abused its discretion. *In re D.K.*, 2015-Ohio-546, ¶ 11 (2d Dist.). The *Unger* factors include:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Unger* at 67-68.

{¶ 68} Furthermore, under Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Loc.R. 35(C) of the Cuyahoga County Court of Common Pleas, Juvenile Division ("Loc.R. 35(C)"), also provides:

No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 69} We recognize that

"'[a]ll things being equal, the testimony from a parent would provide more information than not having the parent.'" *In re Sears*, 10th Dist. Franklin No. 01AP-715, 2002-Ohio-368, at ¶ 11, quoting *In the Matter of Vandale*, 4th Dist. Washington No. 92 CA 9, 1992 Ohio App. LEXIS 4306 (Aug. 12, 1992). Because the termination of parental rights is a serious matter, where a parent communicates with the court or counsel to explain a problem attending a hearing, the courts have required that "great care be taken to ensure that due process is afforded parents in parental termination proceedings." *In the Matter of Rachal*, 6th Dist. Lucas No. L-02-1306, 2003-Ohio-1041, ¶ 12. However, "a parent facing termination of parental rights must exhibit cooperation and must communicate with counsel and with the court in order to have standing to argue that due process was not followed in a termination proceeding." *In re Q.G.*, 170 Ohio App.3d 609, 2007-Ohio-1312, 868 N.E.2d 713, ¶ 12 (8th Dist.).

*In re A.W.*, 2020-Ohio-3373, at ¶ 29 (8th Dist.).

{¶ 70} The record reflects that Mother did not appear at the permanent custody hearing, and counsel for Mother moved the court for a continuance. Counsel argued that Mother had informed her that she was being admitted to a treatment center on the date of trial. Counsel argued this was Mother's third attempt to manage her substance abuse issues. Further, counsel indicated this was the first request to continue the trial, and the children had been in the custody of the agency for only 13 months. Counsel requested a continuance of approximately 30 days to allow Mother's completion of the substance abuse program.

{¶ 71} The agency opposed the motion for continuance, arguing that the children had been in its custody for over a year; Mother had failed to successfully complete any services during that time; Mother's alleged participation in treatment starting on the day of trial appeared dilatory; the length of delay of trial was uncertain since it was based upon Mother's completion of substance abuse treatment and coordinating schedules of all parties and defense counsel indicated he would not be available for at least three months; all necessary witnesses were present and prepared to testify; and the local rules precluded continuance on the day of trial if the circumstances leading to the continuance — such as in this scenario — were known prior to trial. The trial court found it was in the best interests of the children to deny Mother's motion and proceed to trial.

{¶ 72} We do not find the trial court's denial of Mother's motion for continuance was an abuse of discretion. Mother could have provided counsel adequate notice of her intention to enter a substance abuse program so that counsel could present a timely motion for continuance and, accordingly, reschedule the permanent custody hearing. However, Mother failed to attend the permanent custody hearing and counsel presented a verbal motion on the date of trial, in contravention to Loc.R. 35(C). Mother's enrollment in a substance abuse program on the date of trial could have been construed as dilatory. And all counsel and witnesses, excluding Mother, were present and ready to proceed with trial. *See In re C.W.*, 2020-Ohio-3189, ¶ 22 (8th Dist.) ("The record reflects that a continuance would have caused great inconvenience to the agency witness, opposing counsel, the

guardian ad litem, and court personnel, who were present and ready to proceed with the hearing."). We cannot conclude that the trial court abused its discretion when it denied Mother's request for a continuance. Thus, Mother's second assignment of error is overruled.

{¶ 73} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
MARY J. BOYLE, J., CONCUR