[Cite as *In re S.H.*, 2024-Ohio-4495.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE S.H., ET AL. | : | |
| | : | Nos. 113775, 113776, and |
| Minor Children | : | 113849 |
| | : | |
| [Appeal by L.H., Father, | : | |
| and A.D., Mother] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 12, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22910487 and AD22910488

---

### *Appearances:*

Law Office of Victor O. Chukwudelunzu, LLC, and Victor
Victor Chukwudelunzu, *for appellant* Father L.H.

Wegman Hessler Valore and Matthew O. Williams, *for
appellant* Mother A.D.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} A.D. ("Mother") and L.H. ("Father") (collectively "parents") separately appeal the juvenile court's judgment granting permanent custody of S.H. (d.o.b. 02/03/2010) and N.H. (d.o.b. 01/16/2011) (collectively "children") to the Cuyahoga

County Division of Children & Family Services ("CCDCFS" or "agency"), which we have consolidated for disposition. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} On October 14, 2022, CCDCFS filed a complaint for neglect and dependency and sought temporary custody of S.H. and N.H., alleging that Mother and Father have failed to maintain stable and appropriate housing and abuse marijuana. The complaint further alleged that Mother has three other children who were placed in the legal custody of relatives due to physical abuse, educational neglect, Mother's mental health issues, and Mother's substance abuse issues. Additionally, the complaint noted that in 2016, the agency previously filed a complaint regarding children, but the case was dismissed because CCDCFS was unable to locate Mother and/or Father.

{¶ 3} The children were placed in emergency predispositional temporary custody of CCDCFS. Shortly thereafter, the parents defied the court's order and absconded with the children that ultimately resulted in numerous court orders to show cause and the issuance of arrest warrants for the parents. On January 5, 2023, parents and children were located in a motel. The parents were arrested, and the children were returned to CCDCFS's custody.

{¶ 4} Shortly thereafter, Mother and Father stipulated to an amended complaint, the children were adjudicated neglected and dependent, and the children were placed in the temporary custody of CCDCFS. CCDCFS developed a case plan

with an ultimate goal of reunification. The case plan included services for addressing educational neglect, substance abuse, mental health, and lack of stable and appropriate housing.

{¶ 5} On September 7, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody.

{¶ 6} The motion to modify temporary custody to permanent custody proceeded to trial on March 13, 2024, where the following relevant testimony was presented.

{¶ 7} Morgan Honeywood ("Honeywood"), a child protection specialist at CCDCFS, testified that she had been assigned this matter in March 2023. After the children were returned to CCDCFS's temporary custody, they were taken for a medical examination. The medical examination noted that the children exhibited deficiencies in literacy and basic hygiene, stemming from educational and medical neglect.

{¶ 8} Following the medical examination, S.H. was diagnosed with cognitive disorder, speech delay, academic delays, and a history of neglect. Later, S.H. was diagnosed with secondary neurodevelopmental disorder, trauma- and stressor-related disorders, and other specified neurodevelopmental disorders associated with severe neglect.

{¶ 9} N.H.'s deficits included deficiencies of age-appropriate knowledge, developmental delays, and anxiety disorder. The records indicated that N.H. had a history of neglect that has impaired her functioning and is unable to navigate basic

activities and situations. N.H. was also noted to suffer from cognitive delay, speech and language delay, fine motor delay, pica, excessive sleepiness, anemia, educational neglect, joint pain, toe walking, and possible intellectual disability and ADHD.

{¶ 10} Neither of the children had ever attended school prior to placement with their foster family. S.H., who was in eighth grade, was just learning how to write in complete sentences. N.H., who was in seventh grade, could not read, write, or speak in complete sentences. Neither of the children were socialized because they spent most of their days in bed watching YouTube videos.

{¶ 11} Honeywood testified regarding the case plan that was developed for reunification. The children were up-to-date and engaged with their case plan services since placement in foster care.

{¶ 12} At the time of trial, the children were 13 and 14 years old. They had been placed together at first but were ultimately separated because N.H. had made false claims to law enforcement about her caregivers. The claims were later determined to be unsubstantiated, but the caregivers were unable to continue providing care to N.H. thereafter. At the time of trial, S.H. and N.H. were both thriving at their foster placements and in school.

{¶ 13} The parents were not as successful with the case plan objectives. Honeywood testified that the parents were accommodated significantly — all of their case plan services were virtual to assist with their transportation issues; they were provided bus passes; and visitations were scheduled at locations convenient for the

parents. Honeywood referred them to Beech Brook for parenting services, but the parents never initiated or engaged with the service. The parents were then linked to Lakewood Area Collaborative for parenting services, but attended only one class.

{¶ 14} Raymond Oslin, a Lakewood Area Collaborative representative, testified that he was assigned to work with Mother in October 2023, but since the parenting services are only offered during two sessions a year, he referred Mother to Recovery Resources. He assisted Mother with completing an application for Section 8 housing. He testified, however, that housing was not the only concern he had with the parents and noted that Mother herself did not feel that she would ever be able to maintain an "above-the-table" job. (Tr. 161.)

{¶ 15} Brenda Eafford, a team leader at Recovery Resources, indicated that parents participated in the parenting program in January 2024. She testified that neither parent had graduated high school and that Father "felt that education was a conspiracy" and "overly hyped." (Tr. 29.) Father acknowledged to Eafford that his 12- and 13-year-old children were only reading at "a third-grade level." (Tr. 30-31.) She also provided the parents with housing resources. The parents completed the parenting program in February 2024.

{¶ 16} Despite completing the Recovery Resources parenting program, Honeywood testified that she was unable to determine whether a benefit had been derived from the program because S.H. only agreed to attend the weekly supervised visits one time per month. She testified, however, that at recent visits, parents made inappropriate comments to the children and whispered things to S.H. that upset her.

{¶ 17} Honeywood noted that Mother had been receiving services at Reach Behavioral Health when Honeywood had been assigned to the case in March 2023 but she was unsuccessfully discharged from the program. Honeywood referred Mother to Signature Health for dual diagnosis services for substance abuse and mental health, but Mother did not engage with Signature Health initially. When she finally did engage, there was a waiting list that delayed her assignment to a counselor until January 2024. Honeywood testified that Mother missed some sessions but has otherwise been engaged with the Signature Health services since January 2024.

{¶ 18} Honeywood also discussed Mother's drug screens. Mother tested positive for marijuana through December 2023 and then failed to submit screens as requested. When asked why she skipped those drug screens, Mother stated that she had prioritized the housing issue. Honeywood testified that both mental health and substance abuse remained concerns of CCDCFS at the time of trial.

{¶ 19} Regarding Father's mental health and substance abuse treatment, Honeywood testified that he completed a dual diagnostic assessment through the court that resulted in a diagnosis of cannabis use disorder. He was referred for treatment at Recovery Resources where he participated in a drug and alcohol education class. He was also referred to Signature Health for in-depth screening and evaluation.

{¶ 20} Father participated in some ordered drug screens, and tested positive for marijuana, but he had not submitted to any drug screen since December 2023. Substance abuse remained a concern for Father at the time of trial due to his positive

tests and failure to engage in further drug screens and Honeywood was unable to confirm his sobriety.

{¶ 21} Regarding housing and basic needs, the parents were referred to CMHA, EDEN, and the Lakewood Area Collaborative where they were actively engaged. At the time of trial, parents were staying with an uncle in a two-bedroom apartment but were not listed on the lease. Neither parent had secured employment at the time of trial, though Father testified that he did some "gig work" but did not provide documentation supporting the regularity of this work or the wages earned. Moreover, the parents had recently lost their car. Since, at the time of trial, the parents had no source of income and their housing and basic needs remained an active concern, Honeywood was unable to confirm that the housing and basic needs services were no longer a concern.

{¶ 22} The children's guardian ad litem ("GAL") opinioned that agency custody would be in the best interest of the children, citing the lack of medical and educational history prior to CCDCFS's involvement. The GAL opined that the children really need permanence due to the fact that they have no vocabulary and have not experienced much of anything outside of their households. Being old enough to express their wishes, he noted that S.H. had no desire to return to her parents while N.H. did wish to eventually return to her parents' custody, but admitted that if it was not possible, she would like to at least return to a placement where she is with S.H.

{¶ 23} The trial court terminated all parental rights and ordered that the children be placed in the permanent custody of CCDCFS. Mother and Father both appealed separately, and we consolidated the appeals for disposition.

{¶ 24} Mother assigns two errors for our review:

I. The trial court's decisions to terminate [Mother's] parental rights to N.H. and S.H. were against the manifest weight of the evidence.

II. The trial court erred and in so doing prejudiced appellant by relying upon impermissible evidence in violation of [Mother's] constitutional right to confront and cross-examine the witnesses against her.

{¶ 25} Father assigns three errors for our review:

I. The juvenile court's ruling granting permanent custody of S.H. and N.H. to CCDCFS was against the manifest weight of the evidence.

II. The juvenile court's ruling granting permanent custody of S.H. and N.H. to CCDCFS was in error, because appellee did not show that it made "reasonable efforts" to reunite the family pursuant to R.C. 2151.419.

III. The juvenile court's ruling granting permanent custody of S.H. and N.H. to CCDCFS and terminating Mother's parental rights violated state law and Father's right to due process as guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16, Article I of the Ohio Constitution.

## II. Law and Analysis

{¶ 26} Mother's and Father's first assignments of error identically contest the trial court's judgment granting permanent custody to CCDCFS as against the manifest weight of the evidence.

{¶ 27} CCDCFS sought custody in this matter pursuant to R.C. 2151.413. Under R.C. 2151.413, CCDCFS first obtained temporary custody of the children, then filed a motion for permanent custody.

{¶ 28} R.C. 2151.414(B)(1) provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile court may grant a child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. "Clear and convincing evidence" is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 29} In the instant matter, neither Mother nor Father challenges the second prong, so our review is limited to the first prong, which pertains to the best interests of the children.

{¶ 30} In performing a manifest-weight review of a parental rights matter, the Supreme Court of Ohio has recently clarified that

> [w]hen reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* [*v. Volkman*, 2012-Ohio-2179, ¶ 20]. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

{¶ 31} As previously stated, Mother and Father have only challenged the juvenile court's best interest determinations pursuant to R.C. 2151.414(D)(1). R.C.

2151.414(D)(1) dictates that the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} The best-interest determination focuses on the best interests of the children, not the parents. *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.). The juvenile court is required to consider each R.C. 2151.414(D)(1) factor, and no factor is afforded greater weight than the others. *In re T.H.*, 2014-Ohio-2985, ¶ 23 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. We review each of the (D)(1) factors in turn.

{¶ 33} Subsection (a) considers the interaction and interrelationship of the children with their parents, siblings, relatives, and foster caregivers. There is no question based on the evidence in the record that N.H. is well-bonded with her parents. S.H., on the other hand, is not as bonded with her parents. Evidence was also presented that N.H. and S.H. are well-bonded with each other. No concerns were expressed relating to the foster placements, and in fact, it was determined that the children were thriving at them because they were finally attending school and learning basic hygienic and social skills that they had not learned in the care of their parents.

{¶ 34} Subsection (b) pertains to the wishes of the children, as expressed directly by the children or through the guardian ad litem. The children were 13 and 14 years old at the time of trial, and both participated in an in camera review with the court where, once again, S.H. indicated her desire to remain in foster care while N.H. indicated her desire to return to her parents. The GAL echoed these sentiments at trial but opined that he felt it was in the best interest of the children to be placed in permanent agency custody.

{¶ 35} Subsection (c) considers the custodial history of the child, including whether the child had been in temporary custody for at least 12 of a consecutive 22-month period. It is not disputed that the children had been removed and placed in temporary custody since October 26, 2022, until the time of trial in March 2024.

{¶ 36} Subsection (d) considers the child's need for a legally secure permanent placement and whether that type of placement can be achieved without

a grant of permanent custody to the agency. The juvenile court found that the children could not be placed with either of the parents within a reasonable time or should not be placed with the parents as required by the factors in R.C. 2151.414(E)(1)-(16). Moreover, both parents simply argue that they need more time to resolve the issues leading to removal, but such removal lasted for about a year and a half. In the initial stages after a case plan was developed, the parents cut ties with CCDCFS and absconded with the children, where they were later found living in a motel. The parents, in avoiding CCDCFS, were afforded numerous opportunities by CCDCFS and instead chose to avoid CCDCFS in the initial stages. As a final point, the parents previously managed to evade CCDCFS intervention when this matter was initially filed in 2016, but was later dismissed because the parents could not be located.

{¶ 37} Subsection (e) requires consideration that any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child. The State concedes that this subsection is inapplicable in the instant matter.

{¶ 38} Based on the totality of the foregoing, we find that there was clear and convincing evidence from which a trier of fact could have determined that permanent custody was in the best interest of the children. The trial court complied with the best interest findings listed in R.C. 2151.414(D)(1) and its decision to grant permanent custody to the agency is not against the manifest weight of the evidence. We therefore overrule Mother's and Father's first assignment of error.

{¶ 39} Father's second assignment of error contends that the trial court erred in determining that CCDCFS made reasonable efforts to reunify the family pursuant to R.C. 2151.419. Mother also makes this argument, but it is within her first assignment of error.

{¶ 40} R.C. 2151.419 provides that the trial court must find that the agency, in this case, CCDCFS, "has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1). The Supreme Court of Ohio has held that R.C. 2151.419(A)(1) "does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413," but that "the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights." *In re C.F.*, 2007-Ohio-1104, ¶ 43.

{¶ 41} The record in this matter demonstrates that the agency formulated a case plan for parents and children. Father contends that he made substantial progress in the housing services of the case plan and that the family was still unable to secure housing. We note and acknowledge both Mother's and Father's efforts in completing their services, especially as the trial date neared.

{¶ 42} However, Mother and Father did not elect to take advantage of CCDCFS's services in the initial stages of the case and, instead, chose to abscond with children even after it was determined that it was in the children's best interest to be temporarily in agency custody. Even after the parents absconded with the

children in violation of the court's temporary custody order, CCDCFS accommodated the parents and their financial situation through transportation assistance and finding virtual programming.

{¶ 43} At trial, even, neither Father nor Mother had verifiable income, which is essential for keeping and maintaining housing; it also was not clear that Mother and Father had resolved the concerns that CCDCFS had about substance use and parenting abilities.

{¶ 44} We therefore find that the record supports a finding that CCDCFS made reasonable efforts to reunite the children with the parents when children were committed to the emergency custody of the agency and when they were adjudicated and committed to temporary custody of the agency.

{¶ 45} Father's second assignment of error is overruled.

{¶ 46} Mother's second assignment of error argues that the trial court erred in relying on impermissible evidence in making its determinations regarding permanent custody. Particularly, Mother takes issue with Honeywood, who was not qualified as an expert, relying on hearsay statements from children's medical and school records.

{¶ 47} Hearsay, defined as "a statement, other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). If hearsay falls within any of the exceptions enumerated in Evid.R. 803, then it may be admissible. Moreover, a juvenile court judge is presumed to be able to disregard improper testimony. *In re*

*J.T.*, 2009-Ohio-6224, ¶ 70 (8th Dist.).  Therefore, in parental rights cases, even if hearsay evidence is admitted in error, it is not considered prejudicial unless it is shown that the trial court relied on improper evidence in making its decision.  *Id.*

{¶ 48} Beginning with the medical records, these fall within a recognized hearsay exception.  We acknowledge that the records were certified by the records custodian pursuant to R.C. 2317.422, which provides for the authenticity of the records in lieu of testimony by the custodian in court.  Moreover, the medical records were for diagnosis or treatment and, therefore, fit within Evid.R. 803(4), which provides that statements "made for purposes of medical diagnosis or treatment and describing medical history, or past and present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof . . ." are admissible.  The medical records read by Honeywood and admitted into evidence were plainly made for purposes of diagnosis or treatment because of the significant diagnoses and treatment planning that came therefrom, and the records showed the extent of the children's lack of medical care prior to placement in the temporary custody of the agency.

{¶ 49} The school records that parents categorize as hearsay consist of a "workbook" from S.H.'s language arts class documenting that S.H. made progress in language arts and is learning to write in complete sentences.  It appears that this document was introduced to corroborate the assessments made by medical professionals when the children underwent diagnostic testing.  For example, just before the school records were reviewed, Honeywood testified as to Dr. Carol

Delahunty's office notes. Dr. Delahunty, a developmental behavioral pediatric doctor, specifically noted that S.H., though 14 years old, is cognitively similar to a 7-year-old. Her notes go on to indicate that N.H. has been going between disability classes and general education classes because she "cannot read, write and speak in complete sentences, name colors, numbers. . . ." (Tr. 82.)

{¶ 50} We need not decide whether the admission of the school records was erroneous; the content of the records is replicated and supported by the content of the medical records, which were properly admitted under Evid.R. 803(4). Therefore, to the extent the trial court relied on the evidence therein, it would not be prejudicial because it was properly admitted into the record via the medical records.

{¶ 51} We therefore overrule Mother's second assignment of error.

{¶ 52} Father's third and final assignment of error contends that removing the children from Father's care was a violation of his procedural due process rights pursuant to the U.S. and Ohio Constitutions. Father's argument is generally couched a violation of his right to parent his own child and appears to contest the entire parental rights procedure as unconstitutional, particularly pointing to the fact that he was not afforded more time to complete his case plan. Under R.C. 2151.415(A), CCDCFS was required to file a dispositional motion not later than 30 days prior to the expiration of the temporary custody order, so it appears that Father is challenging the constitutionality of this statutory section.

{¶ 53} Father did not raise or preserve his constitutional arguments in the juvenile court. "Even if the appellant failed to object to the constitutionality of the

statute at the trial-court level, appellate courts may elect to review the matter for plain error. *State v. Quarterman*, 2014-Ohio-4034, ¶ 16. We do not elect to do so here, as Father fails to fashion a plain-error argument on appeal or develop his argument beyond alleging a due process violation based on his view that he was not afforded enough time to complete the case plan. *See, e.g. State v. Hollis*, 2020-Ohio-5258, ¶ 50 (8th Dist.).

{¶ 54} We therefore overrule Father's third assignment of error.

### III. Conclusion

{¶ 55} We overrule all of Mother's and Father's assignments of error and affirm the trial court's judgment granting permanent custody of the children to the agency.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

FRANK DANIEL CELEBREZZE, III, JUDGE

MICHELLE J. SHEEHAN, P.J., and
SEAN C. GALLAGHER, J., CONCUR