[Cite as *In re L.V.*, 2024-Ohio-5917.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE L.V.                                           :
                                                     :           No. 114070
A Minor Child                                        :
                                                     :
[Appeal by T.V., Mother]                             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 19, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22903283

---

### *Appearances:*

Wegman Hessler Valore and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant-mother, T.V. ("Mother"), appeals an order granting permanent custody of her minor child, L.V., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). She claims the following errors:

1. The trial court's decisions to terminate appellant's parental rights and award permanent custody of L.V. to CCDCFS were against the manifest weight of the evidence.

2. The trial court erred to appellant's prejudice by admitting and relying on improper evidence.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On March 31, 2022, CCDCFS filed a complaint alleging that L.V. (d.o.b. Sept. 19, 2019) was neglected and abused and requesting a predispositional order granting temporary custody of the child to the agency. Following a hearing, the trial court granted emergency temporary custody of the child to CCDCFS. L.V. was two years old when he was taken into custody. (Mar. 31, 2022, tr. p. 4.)

{¶ 4} In May 2022, the complaint was amended to remove some allegations and to request temporary custody. As amended, the complaint alleged that (1) injuries were observed on L.V.'s body and Mother could not adequately explain how he received these injuries; (2) Mother had mental-health issues that impacted her ability to parent L.V.; and (3) L.V. tested positive for high levels of lead. Mother appeared in court and admitted to the allegations set forth in the amended complaint. Following a hearing held on June 1, 2022, the trial court determined that L.V. was abused and neglected and ordered him placed in the temporary custody of CCDCFS.

{¶ 5} The order of temporary custody was subsequently extended in February 2023, based on Mother's efforts to comply with her case plan. However, in June 2023, CCDCFS filed a motion seeking to modify temporary custody to permanent

custody.  Thereafter, G.M. ("Father"),[1] L.V.'s father, filed a motion asking the court to grant legal custody of L.V. to his mother ("paternal grandmother").  G.M. argued that paternal grandmother maintained an appropriate home with government assistance and that she wanted to take legal custody of L.V.

{¶ 6} The trial court conducted a trial on the agency's motion for permanent custody and Father's motion for legal custody in May 2024. Chelsay Eskra ("Eskra"), who worked in the Family Search and Engagement Department of CCDCFS as an "emergency search person," testified at trial that she first encountered L.V. when she was working as an investigative worker with CCDCFS. She explained that L.V. was removed from Mother's care after the agency received an emergency call through its hotline.  The agency responded to the call and discovered that L.V. had various marks and bruises on his body including a cigarette burn on his forehead.

{¶ 7} During the ensuing investigation, Mother reported that L.V. was burned when ash fell onto his head from a cigarette held by a relative, who physically disciplined the child for touching a pregnant cat. (Tr. 29.)[2]  Eskra testified, over objection, that medical professionals did not find Mother's explanation plausible. (Tr. 29.)  The medical professionals who examined L.V. found other circular scars on L.V.'s body, indicative of other cigarette burns.  (Tr. 32-33.)  The physical

---

[1] Father is not a party to this appeal.  Therefore, our decision is limited to the issues raised by Mother.

[2] Unless otherwise noted, all references to the transcript refer to the transcript of the trial held on May 1 and 2, 2024.

examination also revealed that L.V.'s front teeth were rotting and required removal. Blood testing indicated L.V. had high levels of lead in his blood.

{¶ 8} Eskra did not visit the house when L.V. was removed. However, she visited the house in connection with another case and she found that the living conditions at the time of her visit were "deplorable." (Tr. 27.) There were holes in the floor, there were broken and missing windows, and there was trash strewn about. (Tr. 27.) The home was not abandoned but "it did not look livable." (Tr. 25.) There were also concerns that other adults in the house were "under the influence of substances." (Tr. 25.)

{¶ 9} The agency was concerned about L.V.'s abuse and the inability of his parents to provide for his basic needs and safety. At the time of L.V.'s removal, both parents were homeless and suffering from mental illnesses. Mother told agency caseworkers that she had previously treated with mental-health professionals. She was also receiving social security benefits due to a cognitive disability. (Tr. 39.)

{¶ 10} During the initial investigation, Father informed the agency that he was "bipolar" and "schizophrenic." (Tr. 41.) He also stated that he had recently been released from a hospital and that he was "medication-compliant." (Tr. 41.) However, prior to his hospitalization, he was not compliant with his mental-health medications. When Eskra discussed the issue of Father's mental-health issues with Mother, "she didn't have any concerns for it." (Tr. 42.) However, Mother told Eskra, that Father was using methamphetamines. (Tr. 42.)

{¶ 11} Dr. Douglas Waltman ("Dr. Waltman"), a private psychologist with a consulting contract with the juvenile court's diagnostic clinic, wrote a report of the psychological evaluation he performed on Mother one year before trial. According to the report, introduced into evidence as CCDCFS's exhibit No. 3, Mother acknowledged that Father had a history of violence but she denied there was any domestic violence in their relationship.

{¶ 12} Based on the evaluation, Dr. Waltman expressed concerns that Mother would struggle to learn the parenting skills necessary to parent a child such as L.V., who has been impacted by trauma. He stated that Mother is illiterate and that she refuses to accept responsibility for the trauma L.V. has experienced. (Tr. 59.) Dr. Waltman explained that Mother's refusal to accept responsibility for her role in L.V.'s trauma is problematic because unless she recognizes her own contribution to the problem, she will think there is no need to change her behavior. (Tr. 59.)

{¶ 13} Dr. Waltman conducted a second evaluation of Mother known as the "Allocation of Parental Rights and Responsibilities Report." During the second evaluation, Mother reported to Dr. Waltman that Father tried to drown L.V. (Tr. 62.) She also reported that L.V.'s paternal grandmother "would scream in the child's ears" when she and L.V. were living with her. (Tr. 62.)

{¶ 14} As part of the second evaluation, Dr. Waltman asked Mother to perform an "improvement task" with L.V. designed to assess her ability to manage and correct L.V. According to Dr. Waltman, Mother's performance on the

"improvement task" was "less adequate than what I normally see." (Tr. 70-72.) She gave "really very little attention" to the task "and then just went off to other things[.]" (Tr. 72.) Her inadequate performance was consistent with his belief that Mother "might have difficulty providing a higher level of cognitive parenting" as would be needed given L.V.'s history of trauma. (Tr. 72-73.) Dr. Waltman also expressed concerns that Mother's intellectual disability made it easy for others to manipulate her and to attract the wrong sort of partners. (Tr. 69.)

{¶ 15} Mother admitted to Dr. Waltman that she sometimes had "severe problems with depression and anxiety," which Dr. Waltman explained could make her "emotionally detached," "inattentive," or "irritable." (Tr. 67.) Dr. Waltman explained, however, that if the depression and anxiety is properly treated, the treatment can mitigate those concerns. (Tr. 67.) He opined that Mother's newly acquired apartment next door to her mother could provide the social support she needs to parent L.V. (Tr. 77.) He also noted that during Mother's interaction with L.V., they seemed happy together and L.V. did not appear to be afraid of her. (Tr. 101-102.)

{¶ 16} Emily Engman ("Engman"), a licensed clinical social worker from Chrysalis Family Solutions in Wooster, Ohio testified that she was called in to help decrease the "escalation" L.V. displayed following visitation. (Tr. 113.) In assessing L.V., Engman and a colleague completed a process known as Neurosequential Model of Therapeutics brain mapping ("NMT"). (Tr. 114.)

{¶ 17} NMT is an assessment tool based on data provided from a person's family background and life experiences. (Tr. 114-115.) In performing NMT in this case, Engman and her colleague reviewed the psychological assessment completed for the court, medical records, foster-care documents, and communications related to behavioral challenges that occurred prior to L.V.'s current placement. (Tr. 115.) Engman collected the data and made recommendations. Her colleague reviewed Engman's recommendations and then scored and rated the scales on the brain map. (Tr. 116.) The results indicated that L.V. would struggle more than a neurotypical child his own age when performing basic regulatory tasks related to eating, sleeping, and the stress response. (Tr. 124-125.)

{¶ 18} Based on the results of the brain mapping, Engman referred L.V. to E.J. Therapies for a full-sensory evaluation. Engman testified over objection to the full-sensory evaluation E.J. Therapies performed. She stated that the results of the sensory evaluation were consistent with early childhood trauma. She further stated, again over objection, that "it was reported" to her that L.V. suffers from gastrointestinal dysregulation after visits with Mother and that he sometimes smears feces on the wall.

{¶ 19} Engman testified that such behaviors are common among children exposed to trauma. (Tr. 143.) She admitted, however, that the disruptions in L.V.'s

life, including his placement with three foster families, may have contributed to his dysregulation.[3] (Tr. 147.)

{¶ 20} Engman testified that L.V. was not having visits with Mother when she first started working on L.V.'s case. However, Engman worked with L.V. and Mother on self-regulation strategies in order to help him move forward when twice-monthly visits resumed in September 2023. She explained that "[i]t's really important that any caregiver caring for [the child] is able to present in a calm and patient manner" and that "a dysregulated adult cannot help regulate a child who's dysregulated." (Tr. 145.) Also, "a highly anxious parent tends to struggle with being able to help a child stay more regulated." (Tr. 145.)

{¶ 21} Engman stated that the first few visits she observed went well. However, during a visit in December 2023, Mother began "raising her voice, her face started to flush," and the visit became tense. Engman believed Mother was putting too much pressure on L.V. to use the bathroom when he did not want to. She also pressured him to interact with relatives, and she forced him to give goodbye hugs and kisses. Engman explained to Mother that it is important to honor her child's wishes, but she continued to pressure him anyway. (Tr. 155, 157-158 and 160.) This behavior recurred in subsequent visits. Mother would repeat Engman's instruction

---

[3] The first foster family moved to Florida and could no longer care for L.V. L.V. was removed from the second foster family because (1) he acted aggressively toward other children in the home, (2) he was eating things that were not food, and (3) he was experiencing gastrointestinal issues. (Tr. 147-148.) He remained with the third family until the time of trial.

to allowing "no" to mean "no," "but then she would go back to asking him again." (Tr. 159-160.)

{¶ 22} Engman eventually stopped facilitating visits. When asked why she stopped, Engman explained that "[L.V.] was still having escalating behaviors," and she did not see "many positive changes with [Mother]'s interactions." (Tr. 162.) According to Engman, Mother continued to pressure L.V. to visit with relatives and give hugs and kisses despite repeated instructions not to. (Tr. 163.) Mother also became frustrated and repeatedly offered L.V. snacks even though she was told to refrain from doing so because he was suffering from stomachaches and diarrhea following visits. (Tr. 165.)

{¶ 23} Finally, Engman testified that she received reports from L.V.'s school that his behaviors regressed after visits with Mother. She explained that when L.V. returned to school on Mondays after a weekend visit, he wanted to be held by teachers and asked questions about when he was going home. She further stated that there were "a few incidents where he ha[d] bitten another child following visits and hit two children following visits." (Tr. 171.)

{¶ 24} According to Carl Mallory-Nichols ("Mallory-Nichols"), an extended services worker with CCDCFS, L.V.'s foster parents also reported regressive behaviors following visits. (Tr. 338-339.) Engman observed that L.V.'s behaviors improved when he was not engaged in visitation and that his behaviors regressed once visits resumed in September 2023. (Tr. 173.) Mallory-Nichols testified to the same improvement in behaviors while visitation was suspended. (Tr. 339.)

{¶ 25} Molly Sandvik ("Sandvik"), an Ohio Certified Prevention Specialist Assistant with Communication Action for Capable Youth, testified that CCDCFS referred Mother to her for her assistance as a parent educator in Richland County, where Mother was residing. Sandvik worked with Mother and L.V. from February 2023 until July 2023, when visitation was suspended. Sandvik endeavored to help Mother understand how trauma impacts children. Sandvik believed Mother increased her understanding of trauma. However, Sandvik had to repeat the same topics multiple times, and she did not think Mother had a "full grasp" of the impacts of trauma on children. (Tr. 199.)

{¶ 26} Sandvik explained that Mother also worked with another provider to improve her parenting skills in a program called Triple P Parenting. (Tr. 200.) Sandvik explained that Mother "was very engaged" and that "[s]he really tried to understand[.]" (Tr. 203.) Sandvik thought "she was trying very hard to succeed." (Tr. 203.)

{¶ 27} However, during a supervised visit at Mother's apartment, Sandvik observed an argument between Mother and a caseworker. (Tr. 204.) The caseworker asked Mother about several items that were missing from the apartment, and Mother revealed that her live-in boyfriend had taken them when he moved out. The caseworker was surprised to learn that Mother had a live-in boyfriend. And when the caseworker confronted Mother about him, she became agitated and started to cry. (Tr. 212.) L.V. noticed his mother was crying and stated, "[M]ommy is sad, mommy is crying." (Tr. 213.) After the visit, Sandvik explained

to Mother how the argument and her crying was distressing to L.V. (Tr. 214.) Once Mother realized the impact the incident had on L.V., she "felt bad about that." (Tr. 214.) On cross-examination, Sandvik reaffirmed the efforts Mother made to improve her parenting skills. She also stated that there was a bond between Mother and L.V. (Tr. 231.)

{¶ 28} Former foster parent, Elizabeth Gillis ("Gillis"), testified that she cared for L.V. from late 2022 through April 2023, when she moved back to Florida. Gillis testified that when L.V. first came to stay with her, he ate "stuff in the yard or stuff that was on the floor." His teeth were rotten and some of them had been removed shortly before he was placed with her. (Tr. 251-252.) Finally, Gillis testified that L.V. regressed in his toilet training following visits with Mother and that, to ensure consistency, she asked Mother to make sure he uses the restroom during visits.

{¶ 29} Mallory-Nichols testified that CCDCFS developed a case plan for Mother and Father with the goal of reunification. (Tr. 261.) Mallory-Nichols had very little contact with Father because although he contacted Father several times, Father never responded to his messages. There was no evidence that Father complied with his case plan.

{¶ 30} Mother's case plan included services to address Mother's issues related to mental health, housing, parenting education, and domestic-violence education. Mother satisfied the housing objective when she moved into an appropriate apartment in Richland County. (Tr. 272-273.) Mother also completed

a domestic-violence program. However, the agency remained concerned about her judgment when it was discovered that she had an undisclosed live-in boyfriend while she was trying to secure unsupervised visits in her home. (Tr. 272-277.)

{¶ 31} Mother was referred for mental-health services due to chronic mental-health issues and a cognitive disability. (Tr. 280.) The agency referred Mother to Life Solutions, but she left the program because she "did not like the provider." (Tr. 280-281.) Mother resumed mental-health services through Third Street Family House ("Third Street"). However, when Mallory-Nichols asked Mother for the name and phone number of her provider, she was unable to provide the name of her therapist. (Tr. 283.) She was also unable to provide the therapist's phone number. (Tr. 284.)

{¶ 32} Although Mother reported that she was engaged in mental-health services, CCDCFS was never able to verify that her engagement in mental-health services at any time during the pendency of this case. (Tr. 311-313.) Yet, Mother admitted that she had previously been diagnosed with ADHD and bipolar disorder, for which she received medication and that she had stopped taking the medication. (Tr. 287.)

{¶ 33} With respect to parenting, Mallory-Nichols testified that although Mother demonstrated appropriate behaviors during visits, she was "inconsistent with actually implementing the desired behavior change." (Tr. 296.) There were times when Mother was asked to stop a particular activity. When this happened, Mother would stop for a minute but then "quickly go right back to doing what she

was just instructed not to do." (Tr. 297.) Mallory-Nichols explained that if the parent is not consistently demonstrating a desired behavioral change, it is hard to consider the objective met. (Tr. 335.)

{¶ 34} Mallory-Nichols testified that CCDCFS investigated relatives as potential caregivers, but these efforts were unsuccessful. The agency investigated L.V.'s paternal grandmother as a possible placement, but her home was not suitable because Father lived with her and he had not resolved any of the issues that caused L.V. to be removed from his custody in the first place. (Tr. 304-305.) L.V.'s maternal relatives were also investigated. They were not approved for placement because the investigation revealed that Mother had been sexually assaulted while living in her mother's home, no action was taken in response to the assault, and the perpetrator of the sexual assault was now married to Mother's sister.

{¶ 35} Mother presented testimony from Charisma Fort ("Fort"), a social worker with the Cuyahoga County Public Defender's Office. Fort testified that she referred Mother to Third Street for services in December 2023, and that Mother had "maybe one conversation" with a therapist. (Tr. 358-359 and 369.) Fort observed three visits between Mother and L.V. and she testified that they went well. Regarding the third visit, Fort stated, "You could tell that they were extremely bonded and they seemed to enjoy the visit." (Tr. 361.)

{¶ 36} After Mother and Father each rested their cases, the court heard from Christina Joliat, the guardian ad litem ("GAL"). The GAL confirmed that her recommendation remained in favor of permanent custody as noted in her written

report. The GAL observed that although Mother completed some of her case-plan services, she "has her own limitations." She believes that Mother does not have the ability to provide the level of care L.V. requires in light of the trauma he has endured.

{¶ 37} The court appointed special advocate ("CASA") also recommended permanent custody in her report and recommendation. The CASA noted that "[w]hile it is evident that [Mother] is highly motivated to regain custody of the child, it appears to this CASA that she exhibits little capability for providing a safe environment for him."

{¶ 38} After considering the evidence and the parties' arguments, the court issued a decision granting permanent custody of L.V. to CCDCFS. Mother now appeals the trial court's judgment.

## II. Law and Analysis

{¶ 39} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "fundamental liberty interest . . . in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14. Thus, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 40} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 2022-Ohio-529, ¶ 49 (8th Dist.). "'[T]he natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 41} All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 2013-Ohio-1704, at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

{¶ 42} Ohio statutes governing child custody and protection "'appropriately reflect the need to balance . . . [the] parents' . . . interest in the custody, care, nurturing, and rearing of their own children, and the State's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]'" *In re P.S.*, 2023-Ohio-144, ¶ 26 (8th Dist.), quoting *In re Thompson*, 2001 Ohio App. LEXIS 1890 (10th Dist. Apr. 26, 2001).

### A. Manifest Weight of the Evidence

{¶ 43} In the first assignment of error, Mother argues the trial court's judgment terminating her parental rights and awarding permanent custody of L.V. to CCDCFS was against the manifest weight of the evidence.

{¶ 44} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. R.C. 2151.414(B)(1)(a)-(e).

{¶ 45} "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 46} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then consider the factors listed in R.C. 2151.414(D) to determine, by clear and convincing evidence, whether it is in the

child's best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *In re H.G.*, 2024-Ohio-3408, ¶ 16 (8th Dist.).

{¶ 47} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 2014-Ohio-2051, ¶ 28 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 48} Given that R.C. 2151.414 requires a juvenile court to find by clear and convincing evidence that the statutory requirements are met, the Ohio Supreme Court has held that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 49} As previously stated, Mother argues the trial court's judgment is against the manifest weight of the evidence. With respect to the manifest-weight-of-the-evidence standard of review, the Ohio Supreme Court held in *In re Z.C.*:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing

the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

### 1. First Prong — R.C. 2151.414(B)

{¶ 50} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that L.V. is not abandoned or orphaned, but he could not be placed with either parent within a reasonable time or should not be placed with the child's parents. The court also found, pursuant to R.C. 2151.414(B)(1)(d), that L.V. has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period.

{¶ 51} When assessing the length of time during which a child has been in agency custody, R.C. 2151.414(B)(1)(e) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In addition, when calculating whether a child has been in an agency's temporary custody for the requisite time, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count." *In re C.W.*, 2004-Ohio-6411, ¶ 26.

**{¶ 52}** CCDCFS removed L.V. from his parents' care on March 30, 2022. He was adjudicated abused and neglected and placed in the temporary custody of CCDCF on June 1, 2022. However, he had been in agency custody for 60 days as of May 29, 2022, and he remained in agency custody until CCDCFS filed the motion to modify temporary custody to permanent custody on June 13, 2023. Thus, L.V. was in agency custody for over 12 months when the motion for permanent custody was filed. And since L.V. remained in uninterrupted agency custody from May 29, 2022, until the time of trial in May 2024, he was in agency custody for 12 or more months of a 22-month period as provided in R.C. 2151.414(B)(1)(d). Therefore, the juvenile court properly found that first prong of the permanent-custody analysis was satisfied under R.C. 2151.414(B)(1)(d).

**{¶ 53}** Though not required to do in light of its finding under R.C. 2151.414(B)(1)(d), the juvenile court also found, pursuant to R.C. 2151.414(B)(1)(a), that L.V. could not be placed with either of his parents within a reasonable time or should not be placed with his parents. "When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E)." *In re L.H.,* 2024-Ohio-2271, ¶ 34 (8th Dist.). "A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent." *In re Ky.D.,* 2024-Ohio-3198, ¶ 36 (8th Dist.), citing *In re Ca.T.,* 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.,* 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 54} The juvenile court found that L.V. could not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(E)(1) and (2). Those provisions state:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code[.]

### a. R.C. 2151.414(E)(1) — Failure to Remedy

{¶ 55} Eskra testified that L.V. was removed from his parents because marks on his body suggested he had been physically abused. The agency's subsequent investigation revealed that L.V.'s parents were homeless, suffered from mental illnesses, and were unable to meet L.V.'s basic needs. This testimony was corroborated by MetroHealth medical records and testimony from Dr. Waltman and Mallory-Nichols.

{¶ 56} Mallory-Nichols testified that although Mother had completed a domestic-violence program, the agency remained concerned about her judgment

after learning she concealed having a live-in boyfriend while she was trying to secure unsupervised visitation in her home. (Tr. 273-277.) There was also no evidence that Mother engaged in mental-health services even though she admittedly suffers from ADHD, bipolar disorder, and has a cognitive disability. According to Dr. Waltman, Mother also suffers from bouts of severe anxiety and depression, which make it more difficult for her to be attentive to L.V.'s needs, particularly when these conditions are left untreated.

{¶ 57} Mother genuinely tried to remedy the problems that caused L.V. to be removed from her care and custody. However, despite diligent efforts from multiple social workers, she failed to demonstrate the behavioral changes necessary to properly care for L.V. Sandvik testified that Mother never fully understood the impact of childhood trauma on her child. (Tr. 199.) Mother demonstrated appropriate behaviors during visits, but she was "inconsistent with actually implementing the desired behavior change." (Tr. 296.) When asked to refrain from a certain activity, Mother would stop briefly but then revert back to doing that which she was instructed not to do. (Tr. 297.)

{¶ 58} Sandvik and Mallory-Nichols's testimonies were corroborated by Dr. Waltman. Dr. Waltman testified that Mother refused to accept responsibility for her role in L.V.'s problems and that her failure to take responsibility prevented her from recognizing areas where her behavior needed to change. Dr. Waltman also explained that Mother performed poorly on the "improvement task" assessment because she failed to maintain her attention on the task. (Tr. 72.) And Engman

testified that she eventually stopped facilitating visits between Mother and L.V. because Mother failed to "make many positive changes" despite Engman's repeated instructions. Meanwhile, L.V. continued to experience gastrointestinal dysregulation following visits due to the apparent stress they caused him. And the evidence showed that Father also failed to work on his case plan and that he failed to remedy the problems that caused L.V. to be removed. Therefore, the trial court's finding that L.V.'s parents failed to remedy the problems that originally caused L.V. to be removed is supported by the manifest weight of the evidence.

### b. R.C. 2151.414(E)(2) — Mental Illness

{¶ 59} The trial court also found that Mother's chronic mental illness and intellectual disability were so severe that Mother was unable to provide an adequate permanent home for L.V. either at the present time or within one year of the court's hearing. Dr. Waltman testified that Mother suffers from several mental-health diagnoses, including ADHD, depression, and anxiety. He also stated that she scored in the "mild intellectual disability range" on an IQ test, and she admitted to agency caseworkers that she has been diagnosed with bipolar disorder. Yet, Mother failed to engage in mental-health services to help her overcome these problems so she can effectively parent her child.

{¶ 60} Despite repeated requests for proof of Mother's participation in mental-health services, Mother never provided any verification. Indeed, Mother's witness, Fort, testified that although she referred Mother to Third Street for mental-health services, Fort could not say that Mother participated in counseling other than

having "one conversation." (Tr. 359, 369.) And, Dr. Waltman testified that Mother needed a combination of medication and counseling to properly treat her mental illnesses. (Tr. 67.) But the record is devoid of any evidence that Mother was treated with either medication or counseling. Furthermore, Dr. Waltham testified that Mother's intellectual disability impaired her ability to learn how to properly parent L.V. Therefore, the trial court's finding that Mother's mental illness and intellectual disability made her unable to provide an adequate permanent home for L.V. at the present time or within one year of the court's hearing is supported by the manifest weight of the evidence.

### 2. Second Prong — Best Interest of the Child

{¶ 61} Having determined that the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time and that Mother's untreated mental illness made her unable to care for L.V., we now turn to the second prong of our analysis that requires the court to determine, by clear and convincing evidence, whether the order granting permanent custody of L.V. to the agency pursuant to R.C. 2151.414(D) is in the child's best interest.

{¶ 62} In determining the best interest of the child, a juvenile court may apply one of two different tests set forth in R.C. 2151.414(D)(1) and (D)(2). *In re A.F.,* 2023-Ohio-4423, ¶ 41 (8th Dist.), citing *In re S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.).

{¶ 63} In determining the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including but

not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 64} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, 2020-Ohio-5102, ¶ 31. "Consideration is all the statute requires." *Id.*

{¶ 65} In analyzing the best-interest factors listed in R.C. 2151.414(D)(1)(a), "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.,* 2015-Ohio-2410, ¶ 30 (8th Dist.).

{¶ 66} Alternatively, the court may apply the second test set forth in R.C. 2151.414(D)(2), which provides:

> If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent

custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 67} If all the factors enumerated under R.C. 2151.414(D)(2) are applicable, permanent custody is per se in the child's best interest, and the juvenile court must commit the child to the permanent custody of the agency. *In re G.A.,* 2020-Ohio-2949, ¶ 61 (8th Dist.), citing *In re J.R.,* 2018-Ohio-1474, ¶ 41 (10th Dist.).

{¶ 68} The juvenile court in this case indicated that it considered the factors outlined in R.C. 2151.414(D)(1) when it made the best-interest-of-the-child determination. R.C. 2151.414(D)(1)(a) required the court to consider L.V.'s relationships and interaction with his "parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child."

{¶ 69} Several witnesses testified to an observable bond between Mother and L.V. However, there was also evidence that Mother was insensitive to L.V.'s wants

or needs during visits and that she often forced him to express affection for relatives against his will. These actions had a negative effect on L.V.'s emotional well-being and resulted in regressive behaviors and gastrointestinal dysregulation. L.V.'s emotional well-being and gastrointestinal dysregulation improved when visits were suspended and recurred when visits with Mother resumed. Although a bond between a mother and child is important, a bond by itself is not sufficient to establish that placement of the child with his mother is in the child's best interest. *In re K.S.*, 2024-Ohio-3312, ¶ 57 (8th Dist.), citing *In re Holyak*, 2001 Ohio App. LEXIS 3105, *10 (8th Dist. July 12, 2001). Mother has a bond with L.V., but she lacks the skills to properly care for him and keep him safe.

{¶ 70} The evidence further showed that L.V.'s current foster family is meeting L.V.'s needs. Engman testified that she was working with the foster family and that they had implemented certain interventions to help L.V. learn to self-regulate. Engman did not have any concerns about their implementations. (Tr. 127.) The trial court, therefore, found that this factor weighed in favor of permanent custody and the evidence supports the trial court's conclusion.

{¶ 71} The factor listed in R.C. 2151.414(D)(1)(b) requires the court to consider the child's wishes as expressed directly or through the GAL. L.V. was only four years old at the time of trial and was, therefore, too young to state a preference. However, the GAL stated that she believed permanent custody to be in L.V.'s best interest. Therefore, this factor also weighs in favor of permanent custody.

{¶ 72} R.C. 2151.414(D)(1)(c) requires the court to consider the child's custodial history, including whether the child has been in agency custody for 12 or more months of a consecutive 22-month period. As previously stated, L.V. was taken into custody on April 1, 2022, and he remained in agency custody until the time of trial on May 1, 2024. He was, therefore, in uninterrupted agency custody for over two years. Therefore, this factor weighs in favor of permanent custody.

{¶ 73} The factor listed in R.C. 2151.414(D)(1)(d) deals with the child's need for a legally secure placement and whether such can be achieved without a grant of permanent custody. As previously stated, the evidence clearly and convincingly showed that L.V. should not be placed with either parent within a reasonable time. A trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody. *In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.), citing *In re E.J.*, 2023-Ohio-1376, ¶ 47 (8th Dist.). Therefore, because L.V. should not be placed with either parent, the trial court had no choice but to find that permanent custody is in L.V.'s best interest.

{¶ 74} As previously stated, when analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. And, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, at ¶ 30. Furthermore, the juvenile court is afforded considerable discretion in weighing the factors. *In re K.P.*, 2019-Ohio-181, ¶ 36 (8th Dist.). After reviewing the evidence, we can only conclude

that the trial court's judgment granting permanent custody of L.V. to CCDCFS is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

{¶ 75} The first assignment of error is overruled.

## B. Evidentiary Rulings

{¶ 76} In the second assignment of error, Mother argues the trial court committed prejudicial error by admitting and relying on improper evidence at trial. She contends the trial court erroneously considered Engman's testimony regarding the NMT "brain map," marked as exhibit No. 5, and the full sensory evaluation of L.V. performed by E.J. Therapies, marked as exhibit No. 6. She contends that these exhibits and Engman's testimony regarding the exhibits violated the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, constituted inadmissible hearsay, and constituted inappropriate expert testimony by a lay witness.

{¶ 77} Pursuant to Juv.R. 34(I), "[t]he Rules of Evidence shall apply in hearings on motions for permanent custody." Juv.R. 34(I). *See also In re Washington*, 143 Ohio App.3d 576, 581 (8th Dist. 2001). We, therefore, review the trial court's rulings to determine if they comport with the Ohio Rules of Evidence.

{¶ 78} We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Schleich v. Penn Cent. Corp.*, 2024-Ohio-5005 ¶ 9 (8th Dist.). We, therefore, will not disturb a trial court's evidentiary ruling absent an abuse of discretion.

**{¶ 79}** An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. This court has also held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.).

**{¶ 80}** Despite Mother's argument to the contrary, the Confrontation Clause does not apply to parents in permanent custody proceedings. *In re J.T.*, 2009-Ohio-6224, ¶ 97 (8th Dist.), citing *In re Hitchcock*, 2000 Ohio App. LEXIS 2737 (8th Dist. June 22, 2000); *In re Burchfield*, 51 Ohio App.3d 148, 154 (4th Dist. 1988). "'[T]he Confrontation Clause of the United States Constitution only applies in criminal cases and not to cases involving requests for permanent custody.'" *Id.*, quoting *In re M.W.*, 2005-Ohio-1302, ¶ 3 (8th Dist.). Therefore, we find no violation of the Confrontation Clause in this case.

**{¶ 81}** Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). "If either element is missing — (1) a statement or (2) offered for its truth — the testimony is not hearsay." *State v. Washington*, 2024-Ohio-1056, ¶ 18 (8th Dist.), citing *State v. Holt*, 1999 Ohio App. LEXIS 4149, 8 (9th Dist. Sept. 8, 1996).

**{¶ 82}** A trial judge is presumed to be capable of disregarding improper testimony. *In re S.D-S.*, 2024-Ohio-255, ¶ 36 (8th Dist.), citing *In re Fountain*, 2000 Ohio App. LEXIS 672, 18 (8th Dist. 2000). Thus, even when the trial court

improperly admits hearsay into evidence, the parent must show that the court actually relied on that evidence in rendering its judgment. *Id.* Moreover, "'[t]he erroneous admission of hearsay evidence is harmless if other evidence, apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove.'" *Id.*, citing *In re M.H.*, 2002-Ohio-2968, ¶ 73 (8th Dist.).

### 1. Brain Map

{¶ 83} Mother argues the Brain Map exhibit constituted inadmissible hearsay. CCDCFS argues the brain map and related testimony was not hearsay because it was not offered to prove the truth of the matters contained therein. CCDCFS argues the brain-map evidence was offered to explain why Engman made certain recommendations designed to help L.V. learn to self-regulate.

{¶ 84} The brain map certainly provided a basis for Engman's recommendations. However, Engman testified that the results of the brain map indicated L.V. struggles more than neurotypical children his own age when performing basic regulatory tasks such as sleeping and eating. (Tr. 124-125.) She also stated that L.V.'s struggles are the result of trauma he suffered as a young child. These statements were presented as fact and were, therefore, offered for the truth. (Tr. 124-125.)

{¶ 85} Engman provided the data and recommendations that were entered into the brain-map program but her colleague rated and scored the scales on the map. Although Engman was available for cross-examination, her colleague was not.

Mother also argues that Engman provided expert testimony regarding the brain map even though she was not qualified as an expert and was not cross-examined on the methodology used to support the reliability of the brain map.

{¶ 86} Nevertheless, we find that any error regarding the admission of the brain map into evidence was harmless because the same facts about L.V.'s trauma-related dysregulation were established from multiple other sources of admissible evidence. Mallory-Nichols, Gilles, and Sandvik described their experiences dealing with L.V.'s dysregulation. (Tr. 199, 169, and 331.) And Engman also described her own observations of L.V.'s difficulty with self-regulation irrespective of the brain map. (Tr. 142, 149.) Dr. Waltman described the challenges Mother faced in caring for a traumatized child. (Tr. 59, 72-73.) And Sandvik testified at length that L.V.'s behaviors resulted from childhood trauma that Mother failed to fully understand. (Tr. 199.) Indeed, it was Mother's failure, not only to understand the impacts of trauma on her child, but also her failure to demonstrate an ability to properly care for L.V. that resulted in the decision to grant permanent custody of L.V. to CCDCFS. Therefore, even if the brain-map exhibit had been excluded, it would not have changed the outcome of the trial.

## 2. Sensory Evaluation

{¶ 87} Finally, Mother argues that the sensory evaluation performed by E.J. Therapies constituted inadmissible hearsay. She also argues that no one from E.J. Therapies testified at trial and although Engman testified to its certification by E.J. Therapies, she did not testify to having any involvement with its creation. Mother

contends that "Engman was thus not the correct witness to offer the document because she could not confirm that it was what it purported to be." (Appellant's brief p. 29.)

{¶ 88} CCDCFS argues the sensory evaluation was properly admitted under Evid.R. 803(6) and R.C. 2317.422.

{¶ 89} Evid.R. 803(6) provides an exception to the hearsay rule for records of regularly conducted business activity as provided by Evid.R. 901(B)(10). Under Evid.R. 901(B)(10), medical records may be authenticated by "[a]ny method of authentication or identification provided by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio or by other rules prescribed by the Supreme Court."

{¶ 90} The General Assembly enacted R.C. 2317.422, which provides that medical records are self-authenticating if certain conditions are met. R.C. 2317.422 states, in relevant part:

> [T]he records, or copies or photographs of the records, of a hospital, . . . in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution.

Thus, medical records are admissible even if the records custodian is unavailable at trial, provided that the records custodian provides a certificate as to their

authenticity. *See, e.g., In re S.H.*, 2024-Ohio-4495, ¶ 48 (8th Dist.); *In re M.A.*, 2023-Ohio-3251, ¶ 69-72 (8th Dist.).

{¶ 91} The sensory evaluation included a "certificate of records" signed by the records custodian at E.J. Therapy, certifying that the attached evaluation was a true and authentic copy of the records prepared in the usual course of business. Therefore, the sensory evaluation prepared by E.J. Therapy was properly authenticated and admissible as evidence.

{¶ 92} Moreover, the sensory evaluation merely provided cumulative evidence of L.V.'s trauma. Therefore, even if the sensory evaluation had been admitted in error, the error would have been harmless.

{¶ 93} The second assignment of error is overruled.

{¶ 94} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
SEAN C. GALLAGHER, J., CONCUR